UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

SHAUN SCOTT,

    Plaintiff,    Case No. 2:19-cv-147

v.            Honorable Paul L. Maloney

SHEILA E. O'BRIEN et al.,

    Defendants.
_____/

## OPINION

    This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

### Discussion

  **I.  Factual allegations**

    Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues MDOC Grievance

and Appeals Section Manager Richard D. Russell, MDOC Hearing Officer Sheila E. O'Brien, and MDOC Hearings Investigator D. Durant, together with the following URF officials: Correctional Officer R. Benson; Sergeant E. Koskela; and Warden Connie Horton.

Plaintiff alleges that, on February 23, 2019, Defendant Benson wrote a false Class-II misconduct ticket against Plaintiff. The ticket charged that, during a cell search, Defendant Benson found Plaintiff in possession of yellow highlighters, two pads of Post-It notes, and approximately 50 trifold brown paper towels. None of the items was available for purchase from the commissary. Defendant Benson therefore concluded that the items were stolen from state supplies. In addition, Defendant Benson found that Plaintiff possessed a spray bottle, which contained a liquid mixture that tested positive for bleach, a substance that prisoners were not allowed to possess unsupervised.

Defendant Koskela reviewed Plaintiff on the charge later that day. Upon review, Defendant Koskela elevated the charge from a Class-II to a Class-I misconduct on the charge of possession of dangerous contraband. Plaintiff remained charged on the Class-II violation of possession of stolen property/theft. As a result of the change in designation, Plaintiff was immediately placed on top lock, which required him to remain in his cell until the administrative hearing.

Plaintiff submitted a three-page sworn statement about the charges on February 27, 2019. (Prisoner Misconduct Statement, ECF No. 1-2, PageID.35-37.) In his statement, Plaintiff did not dispute his possession of the items listed in the misconduct charge. Instead, he raised 15 challenges to the procedures followed by Benson in issuing the misconduct charge and documenting the evidence. (*Id.*)

Defendant Hearing Officer O'Brien conducted the disciplinary hearing on March 1, 2019. Defendant O'Brien concluded that, because there existed no verification by a supervisor of

the presence of bleach, she could not find Plaintiff guilty of possession of dangerous contraband.[1] However, O'Brien found that, because Plaintiff admitted that he possessed two highlighters and Post-It notes and because he should have known they were stolen as they were not sold to prisoners, Plaintiff was guilty of possession of stolen property. (Compl., ECF No. 1, PageID.10-11; Class-I Misconduct Hr'g Rep., ECF No. 1-4, PageID.41.)

Plaintiff filed a request for rehearing, contending that Defendant O'Brien violated prison policy by falsely claiming that Plaintiff had admitted possessing the highlighters and Post-It notes. He claimed that, rather than admitting conduct, he had exercised his Fifth Amendment right to remain silent. Plaintiff also complained that Defendant O'Brien falsely stated that Plaintiff had refused the assistance of Defendant Hearing Investigator Durant. Plaintiff argued that O'Brien's failure to follow policy violated Plaintiff's rights to due process and equal protection.

On April 26, 2019, Defendant Russell responded to the request for rehearing. Russell concluded that a prisoner is presumed to possess property found in an area over which he has control and responsibility, and that the prisoner therefore has the burden of proof in rebutting the presumption at a misconduct hearing. Having reviewed the record, Russell found the hearing officer's determination to be based on competent, material, and substantial evidence. (Rehr'g Decision, ECF No. 1-6, PageID.49.)

Plaintiff alleges that, after the hearing, Defendant Benson continued to harass him and threaten him with additional disciplinary tickets. Benson told Plaintiff, "Oh, so Scott, you must think you're big sh*t now huh because the bleach was thrown out. Just so you know the next thing that I do to you will stick!!! You'll soon learn that this is my house, you just live here, for

---

[1] Notwithstanding Defendant O'Brien's finding at the hearing, Plaintiff has attached to his complaint an Evidence Analysis Report that was completed by Defendant Sergeant Koskela and dated February 23, 2019. (Evid. Analysis Report, ECF No. 1-3, PageID.39.) The Koskela report confirms Defendant Benson's claim that the bottle confiscated from Plaintiff tested positive for bleach.

3

now that is. You'd better stay the f*ck outta my way Scott. This is your only warning." (Compl., ECF No. 1, PageID.15.) Plaintiff alleges that Defendant Benson made calls to other prison guards and instructed them to terminate Plaintiff from his job as prisoner observation assistant. Correctional Officer Olmstead (not a Defendant) purportedly listened to Defendant Benson and had Plaintiff terminated from his jobs as prisoner observation assistant and unit porter.

In Count 1 of his complaint, Plaintiff contends that Defendants Durant, O'Brien and Russell deprived him of due process in the misconduct proceedings, through which he ostensibly was deprived of his right to equal protection. In Count 2, Plaintiff asserts that Defendants Horton, Koskela, O'Brien, and Russell failed to protect him from the conduct of their subordinates, resulting in deprivations that inflicted cruel and unusual punishment, in violation of the Eighth Amendment. In Count 3, Plaintiff argues that Defendants Koskela and Russell engaged in a cover-up of the actions of Defendant Benson, in violation of their fiduciary duties and the Eighth and Fourteenth Amendments. In Count 4, Plaintiff alleges that Defendants collectively retaliated against him for exercising his right to utilize the grievance procedure, resulting in Eighth and Fourteenth Amendment violations.

For relief, Plaintiff seeks compensatory damages and permanent injunctive relief.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough

facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III. Judicial immunity

Plaintiff sues Defendant Hearing Officer O'Brien, contending that O'Brien misrepresented facts and violated MDOC policy in finding Plaintiff guilty of possessing stolen property.

The Sixth Circuit, recognizing that a Michigan hearings officer has adjudicatory functions spelled out by statute in the nature of an administrative law judge, has held that hearings

5

officers are entitled to absolute judicial immunity from damages in relation to actions within the officer's authority. *Shelly v. Johnson*, 849 F.2d 228, 229 (6th Cir. 1988); Mich. Comp. Laws §§ 791.251-255. *See also Williams v. McGinnis*, Nos. 02-1336, 02-1837, 2003 WL 245352, at *2 (6th Cir. Jan. 31, 2003) (recognizing that Michigan's prison hearings officers are entitled to absolute immunity); *Thompson v. Mich. Dep't of Corr.*, No. 01-1943, 2002 WL 22011, at *1 (6th Cir. Jan. 2, 2002) (same); *Gribble v. Bass*, No. 93-5413, 1993 WL 524022, at *2 (6th Cir. Dec. 16, 1993) (same). As a consequence, Defendant Hearing Officer O'Brien is absolutely immune from suit for damages for her findings and determinations at Plaintiff's misconduct hearing.

Moreover, injunctive relief is not available under § 1983, because, under the 1996 amendments to that statute, injunctive relief "shall not be granted" in an action against "a judicial officer for an act or omission taken in such officer's judicial capacity . . . unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *accord Savoie v. Martin*, 673 F.3d 488, 496 (6th Cir. 2012). Plaintiff does not allege that a declaratory decree was violated or that declaratory relief was unavailable. Consequently, his claim for injunctive relief is barred. *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999).

Because Defendant O'Brien is immune from suit, Plaintiff's claims against Defendant O'Brien fail to state a claim.

## IV. Supervisory liability

Plaintiff's only allegations against Defendants Horton and Russell involve their failures to supervise. Plaintiff alleges that Defendant Warden Horton failed to adequately supervise and train her subordinates so as to prevent their violations of prison policy and Plaintiff's constitutional rights. Plaintiff contends that Defendant Russell is responsible for conducting

reviews of prison grievances and administrative disciplinary proceedings and therefore responsible for the actions of his subordinates.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has failed to allege that Defendants Horton or Russell engaged in any active unconstitutional behavior. His claims rest entirely on their failures to supervise or adequately respond to Plaintiff's grievances and misconduct appeal. Under the cited authorities, Plaintiff fails to state a claim against Defendants Horton or Russell.

### V. Due process

Plaintiff contends that remaining Defendants Benson, Koskela, and Durant (as well as the previously dismissed Defendants) violated prison policy in charging, reviewing, and investigating the prison misconduct charge. He alleges that the violations of policy denied him due process. In addition, Plaintiff appears to allege that his placement on top lock and loss-of-

7

privileges status deprived him of due process. Finally, Plaintiff appears to contend that Defendant Benson took actions to deprive Plaintiff of his prison jobs without due process.

Defendants' alleged failures to comply with an administrative rule or policy do not themselves rise to the level of constitutional violations. *Laney v. Farley*, 501 F.3d 577, 581 n.2 (6th Cir. 2007); *Brody v. City of Mason*, 250 F.3d 432, 437 (6th Cir. 2001); *Smith v. Freland*, 954 F.2d 343, 347-48 (6th Cir. 1992); *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992); *McVeigh v. Bartlett*, No. 94-23347, 1995 WL 236687, at *1 (6th Cir. Apr. 21, 1995) (failure to follow policy directive does not rise to the level of a constitutional violation because policy directive does not create a protectible liberty interest). Section 1983 is addressed to remedying violations of federal law, not state law. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982); *Laney*, 501 F.3d at 580-81.

Moreover, to the extent that Plaintiff alleges that he had a due process interest in his misconduct proceedings, he fails to state a claim. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by

8

the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[2] for prisoners, like Plaintiff, who were convicted for crimes occurring after April 1, 1987, and before December 15, 2000. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that the loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. 481 F.3d at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that under the now-current iteration of Michigan's good behavior reward scheme, known as disciplinary time,[3] a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. 355 F. App'x at 912; *accord Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at *4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011). In the absence of a demonstrated liberty interest, Plaintiff has no due process claim based on the loss of disciplinary credits. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

In addition, Plaintiff fails to state a due process claim arising out of his placement in administrative segregation. The Supreme Court long has held that the Due Process Clause does

---

[2] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system. Mich. Comp. Laws § 800.33(5).

[3] For some crimes committed after December 15, 1998, and all crimes committed after December 15, 2000, Michigan prisoners are "penalized" with "disciplinary time" under a statute that abolished the disciplinary credit system. Mich. Comp. Laws § 800.34.

9

not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano,* 427 U.S. 215, 225 (1976). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a prisoner's loss of liberty implicates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when a deprivation "will inevitably affect the duration of his sentence" or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 486-87; *see also Jones v. Baker,* 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown,* 62 F.3d 789, 790-91 (6th Cir. 1995).

Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin,* 515 U.S. at 484. Similarly, the Sixth Circuit has held that mere placement in administrative segregation, and placement for a relatively short period of time, do not require the protections of due process. *Rimmer-Bey,* 62 F.3d at 790-91; *see Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010) (61 days in segregation is not atypical and significant). The Sixth Circuit has also held, in specific circumstances, that confinement in segregation for a relatively long period of time does not implicate a liberty interest. *See, e.g.*, *Baker,* 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke,* 111

10

F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). *But cf. Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harden-Bey,* 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest); *Harris v. Caruso,* 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest).

Here, Plaintiff was placed on top lock for the period of time between February 23 and March 1, 2019. When he was found guilty of the Class-II misconduct charge of possessing stolen property, Plaintiff was sentenced to 30 days' loss of privileges.

By the terms of *Sandin* itself, the deprivations suffered by Plaintiff were neither atypical nor significant. In *Sandin*, the Court concluded that 30 days' placement in segregation—a far more significant deprivation than top lock or loss of privileges—was not atypical and significant. The Sixth Circuit has recognized that even longer periods of segregation without due process are not atypical and significant. Plaintiff's allegations therefore fail to implicate a liberty interest.

Moreover, even if Plaintiff were entitled to due process on the misconduct charge, it is clear that Plaintiff received due process of law. Due process of law gives the person the opportunity to convince an unbiased decision maker that, for example, he has been wrongly or falsely accused or that the evidence against him is false. The Due Process Clause does not guarantee that the procedure will produce a correct decision. "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284, n.9 (1980). "[T]he deprivation by state action

11

of a constitutionally protected interest in 'life, liberty or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). Here, Plaintiff received both a preliminary review of the misconduct charge by Defendant Koskela and a full administrative review by Defendant O'Brien. The fact that Plaintiff disagrees with Defendant O'Brien's determination does not demonstrate that he was deprived of due process.

Finally, to the extent that Plaintiff complains that Defendant Benson deprived him of his prison employment without due process, Plaintiff fails to state a claim. The Sixth Circuit has consistently found that prisoners have no constitutionally protected liberty interest in prison employment under the Fourteenth Amendment. *See, e.g.*, *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001) (district court properly dismissed as frivolous the plaintiff's claim that he was fired from his prison job); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (same). Moreover, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 69 F. App'x at 680 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989)). Under these authorities, Plaintiff fails to state a due process claim arising from the termination of his prison employment.

For all these reasons, Plaintiff fails to state a due process claim against any Defendant.

## VI. Equal protection

Plaintiff alleges that Defendants' actions in the misconduct proceedings deprived him of his Fourteenth Amendment right to equal protection. In support of his claim, Plaintiff alleges only that Defendants Russell, O'Brien, and Durant acted with a racially discriminatory purpose in their handling of the misconduct charges.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. Const., amend. XIV; *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). When a law adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard ordinarily governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne*, 473 U.S. at 440.

However, while a convicted prisoner does not forfeit all constitutional protections by virtue of his confinement, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights . . . ." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives – including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing, *inter alia*, *Turner v. Safley*, 482 U.S. 78, 84 (1987)). As a result, to determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the

asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Turner*, 482 U.S. at 89-90.

Here, the Court need not evaluate the existence of a legitimate penological need, because Plaintiff's allegation of discriminatory treatment is wholly conclusory. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Plaintiff completely fails to allege facts that would support a claim of intentional race discrimination by either direct or indirect evidence. *See Davis v. Prison Health Servs.*, 679 F.3d 433, 440 (6th Cir. 2012) (discussing the distinction between direct and indirect methods of proving discrimination). First, Plaintiff alleges no facts constituting direct evidence of a racially discriminatory motive or purpose. *See Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 458 (6th Cir. 2011) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)); *see also Davis*, 679 F.3d at 440. Second, Plaintiff fails to allege a *prima facie* claim under the indirect, burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), because he utterly fails to allege any facts regarding differing treatment of another person who was similarly situated in all relevant respects—much less a similarly situated person belonging to a different racial group. *See Umani*, 432 F. App'x at 458.

Plaintiff's conclusory allegations of racial discrimination therefore fall short of stating a plausible equal protection claim. *Iqbal*, 556 U.S. at 678.

**VII.    Eighth Amendment**

Plaintiff contends that Defendants, in taking actions resulting in his being placed on top lock and being sanctioned with loss of privileges, subjected him to cruel and unusual

punishment in violation of the Eighth Amendment. He also suggests that, by being subjected to a process that he deems unfair, he suffered an Eighth Amendment violation.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. Deprivations that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Rhodes*, 452 U.S. at 347.

The courts routinely have held that even placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). Here, Plaintiff was placed only on top lock and loss of privileges sanctions—deprivations that are significantly less restrictive than segregation and amount to mere temporary inconveniences. Allegations about such temporary inconveniences do not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary

standard of decency. *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see also J.P. v. Taft*, 439 F. Supp. 2d 793, 811 (S.D. Ohio 2006) ("[M]inor inconveniences resulting from the difficulties in administering a large detention facility do not give rise to a constitutional claim." (internal citation omitted)). Although Plaintiff was denied certain privileges as a result of his housing restrictions, he does not allege or show that he was denied basic human needs and requirements. Plaintiff therefore fails to state an Eighth Amendment claim based on his placement on top lock and loss of privileges.

Moreover, to the extent that Plaintiff suggests that being subjected to purportedly unfair procedures implicates the Eighth Amendment, his claim is frivolous. As discussed, the Eighth Amendment is only concerned with conditions intolerable under evolving standards of decency. *Rhodes*, 452 U.S. at 346. Plaintiff's perception of unfairness falls well short of the demanding standard of the Eighth Amendment.

### VIII. Retaliation

Plaintiff sweepingly complains that Defendants took the actions they did in retaliation for Plaintiff's exercise of his right to file grievances. Plaintiff's only specific allegations about retaliation relate to two comments, one by Defendant Benson and one by Defendant Horton. As earlier discussed, Defendant Benson made a comment to Plaintiff after Plaintiff was found not guilty of the charge of possessing dangerous contraband, on the ground that the record did not contain a verification by a supervisor. Benson stated, in effect, that Plaintiff should not be too arrogant about having beaten the charge and that any future charge written by Benson would stick. Benson therefore warned Plaintiff to stay out of Benson's way. Plaintiff also relies on the

16

following comment made by Defendant Horton, in response to Plaintiff's question why Benson was retaliating against Plaintiff:

> Scott, you write grievances against staff and expect them to later be your friend. Nope, I don't think so. . . [.] You've got an old enough number, and you should know how to jail. Now you've got a bull[']s eye on your head. I suggest that you do your sanctions and stay off their radar and maybe they'll find somebody else to deal with. Follow the rules, don't steal my supplies and grow up!

(Compl., ECF No. 1, PageID.13.)

Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The filing of a nonfrivolous prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *Smith*, 250 F.3d at 1037; *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Plaintiff, however, fails to allege facts showing that he filed a nonfrivolous grievance, whether against Defendant Benson or any other URF official. He simply alleges that he has been subjected to retaliation. Plaintiff therefore fails to allege facts sufficient to establish the first prong of his retaliation claim.

Moreover, even if Plaintiff had alleged that he filed a nonfrivolous grievance, he alleges no facts supporting a conclusion that any Defendant's conduct was linked to and motivated by that grievance. It is well recognized that "retaliation" is easy to allege and that it can seldom

be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005); *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987). "[A]lleging merely the ultimate fact of retaliation is insufficient." *Murphy*, 833 F.2d at 108; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). "[C]onclusory allegations of retaliatory motive 'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*, 420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also Murray v. Unknown Evert*, 84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of retaliatory motive with no concrete and relevant particulars fail to raise a genuine issue of fact for trial") (internal quotations omitted); *Lewis v. Jarvie*, 20 F. App'x 457, 459 (6th Cir. 2001) ("bare allegations of malice on the defendants' parts are not enough to establish retaliation claims" that will survive § 1915A screening). Plaintiff merely alleges the ultimate fact of retaliation in this action. He has not presented any facts whatsoever to support his conclusion that any Defendant retaliated against him because he filed a grievance. Indeed, he has not alleged what nonfrivolous grievances he may have filed, against whom, or when those grievances were filed. In the absence of such allegations, no reasonable inference of retaliatory motive arises.

In addition, neither Defendant Benson's nor Defendant Horton's comments support a retaliatory inference. Defendant Benson merely expressed his intent to make sure that any future misconduct charge would contain the necessary proofs to be upheld, and he warned Plaintiff about acting up in Benson's presence. At best, the comment could be construed as the sort of threat or harassment that is too minimal to constitute adverse action. *See Thaddeus* 175 F.3d at 398-99 (holding that minor harassment is insufficient to constitute adverse action, because recognition of

such a standard would "'trivialize the First Amendment'") (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

Defendant Horton's reference to a possible retaliatory motive by Defendant Benson[4] also fails to demonstrate the requisite causation. A defendant's statements or conduct are not evidence of retaliation if the defendant is not the decisionmaker taking the alleged adverse action. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999). Defendant Horton engaged in no active conduct. Any statement he may have made about Defendant Benson's motivation is not evidence of Benson's actual motivation.

For all these reasons, Plaintiff fails to state a retaliation claim against any Defendant.

### IX. Pending motion

Plaintiff has filed a motion (ECF No. 6) seeking a copy of his civil rights complaint for his personal records. Plaintiff contends that he lacks the ability to pay the Court's $23.50 cost of copying associated with the request.

It is well-settled that litigants generally bear their own litigation expenses. *Smith v. Yarrow*, 78 F. App'x 529, 544 (6th Cir. 2003); *Tabron v. Grace*, 6 F.3d 147, 159 (3d Cir. 1993); *Kirk v. Simpson*, No. 93-5668, 1994 WL 443461, at *2 (6th Cir. Aug. 15, 1994) (citing *Moss v. Thomas*, 299 F.2d 729 (6th Cir. 1962) (constitutional right of access to the courts does not encompass a constitutional requirement to waive costs of transcripts, expert witness fees, and fees to secure depositions)); *see also Johnson v. Hubbard*, 698 F.2d 286, 289 (6th Cir. 1983) ("Witness fees clearly fall in the category of items such as trial transcripts, depositions and other documents,

---

[4] The Court does not construe Defendant Horton's statement as indicating that Horton believed that Benson had a retaliatory motive. Instead, Defendant Horton likely was commenting on the reasonableness of a staff member's refusal to do Plaintiff a favor by overlooking misconduct where Plaintiff did not extend the same favor to staff. A refusal to extend leniency in the face of prisoner misconduct does not constitute retaliation.

which the constitution does not require a court, or in practical terms, the federal government, to pay for at the request of the indigent party."). Section 1915(b) "makes no provision for the payment by the government of the costs of transcripts, or any other litigation expenses, and no other statute authorizes courts to commit federal monies for payment of the necessary expenses in a civil suit brought by an indigent litigant." *Tabron*, 6 F.3d at 159. The Court therefore will deny Plaintiff's request for a copy of Plaintiff's complaint unless and until Plaintiff pays the cost of producing that copy.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court also will deny Plaintiff's motion seeking a copy of his complaint at the Court's expense.

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). The Court declines to certify that an appeal would not be in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.

Dated:   November 8, 2019            /s/ Paul L. Maloney
                                     Paul L. Maloney
                                     United States District Judge